**RANDAZZA LEGAL GROUP, PLLC**
Marc J. Randazza (NV Bar No. 12265)
Ronald D. Green (NV Bar No. 7360)
Alex J. Shepard (NV Bar No. 13582)
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117
Telephone: 702-420-2001
Facsimile: 305-437-7662
ecf@randazza.com

*Attorneys for Defendants,*
*Lisa Bloom and the Bloom Firm*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| STEVE WYNN, an individual, | Case No.: 2:18-cv-00609-RFB-GWF |
| Plaintiff, | |
| v. | |
| LISA BLOOM, an individual; and THE BLOOM FIRM, a California Professional Corporation, | |
| Defendants. | |

## DEFENDANTS LISA BLOOM AND THE BLOOM FIRM'S SPECIAL MOTION TO DISMISS PURSUANT TO NRS 41.660

# TABLE OF CONTENTS

DEFENDANTS LISA BLOOM AND THE BLOOM FIRM'S  SPECIAL MOTION TO DISMISS PURSUANT TO NRS 41.660 ................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 1

1.0   INTRODUCTION ......................................................................................... 1

2.0   FACTUAL BACKGROUND ......................................................................... 2

2.1   Plaintiff's General Notoriety .......................................................... 2

2.2   Wynn's Eyesight – A Red Herring Issue ....................................... 3

2.3   Wynn's Notoriety as a Sexual Abuser – The Real Issue ............... 4

2.4   Defendants' Vetting Before Publication & Evidentiary Support for the Statements ...... 7

2.5   Defendants' Statements .................................................................. 9

3.0   LEGAL STANDARDS ............................................................................... 11

3.1   The Anti-SLAPP Statute .............................................................. 11

4.0   ARGUMENT ............................................................................................. 12

4.1   NRS 41.660 Applies in Federal Court .......................................... 12

4.2   Prong One: This Suit is Based Upon Protected Conduct ............. 13

4.2.1   Definition of Issue of Public Interest .............................. 13

4.2.2   Defendants' Statements Were Made in Direct Connection with an Issue of Public Interest ...... 15

4.2.3   Defendants' Statements Were Made in a Place Open to the Public or a Public Forum ...... 16

4.2.4   Defendants' Statements Were Made in Good Faith ......... 16

4.3   Plaintiff Cannot Show a Probability of Prevailing on His Claim ...... 18

4.3.1   Defendants' Statements are True or Substantially True ...... 19

4.3.2   Wynn Cannot Establish the Requisite Degree of Fault ...... 22

4.3.2.1   Steve Wynn is a Public Figure .......................... 22

4.3.2.2   The Actual Malice Standard .............................. 23

4.3.2.3   Plaintiff Cannot Show Actual Malice, or Even Negligence ...... 24

4.4   The Court Should Impose Maximum Statutory Damages of $10,000 on Mr. Wynn Due to His Status as a Repeat SLAPP Plaintiff ...... 27

5.0   CONCLUSION .......................................................................................... 29

# TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..................................................................................................... 27

*Batzel v. Smith,*
  333 F.3d 1018 (9th Cir. 2003) ..................................................................................... 12

*Beckley Newspapers Corp. v. Hanks,*
  389 U.S. 81 (1967) ....................................................................................................... 23

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..................................................................................................... 26

*Biro v. Conde Nast,*
  807 F.3d 541 (2d Cir. 2015) ........................................................................................ 27

*Bongiovi v. Sullivan,*
  122 Nev. 556 (2006) ..................................................................................................... 22

*Bose Corp. v. Consumers Union, Inc.,*
  466 U.S. 485 (1984) ......................................................................................... 22, 23, 24

*Brudvick v. Minor,*
  2006 US. Dist. LEXIS 51608 (D. Colo. July 13, 2006) .............................................. 12

*Church of Scientology v. Wollersheim,*
  42 Cal. App. 4th 628 (1996) ........................................................................................ 13

*Cole v. Patricia A. Meyer & Associates,*
  206 Cal. App. 4th 1095 (2012) .................................................................................... 16

*Copp v. Paxton,*
  52 Cal. Rptr. 2d 831 (Cal. Ct. App. 1996) ................................................................. 24

*Coretronic Corp. v. Cozen O'Connor,*
  192 Cal. App. 4th 1381 (2d Dist. 2011) ..................................................................... 15

*Curtis Publishing Co. v. Butts,*
  388 U.S. 130 (1967) ..................................................................................................... 22

*D.A.R.E. Am. v. Rolling Stone Magazine,*
  101 F. Supp. 2d 1270 (C.D. Cal. 2000) ...................................................................... 23

*Dombrowski v. Pfister,*
  380 U.S. 479 (1965) ..................................................................................................... 12

*Gertz. v. Robert Welch,*
  418 U.S. 323 (1974) ..................................................................................................... 22

RANDAZZA | LEGAL GROUP

*Good Government Group, Inc. v. Superior Court of Los Angeles County,*
  22 Cal.3d 672, 586 P.2d 572 (Cal. 1978) ............................................. 12

*Haack v. City of Carson City*, No. 3:11-cv-00353-RAM,
  2012 U.S. Dist. LEXIS 120137 (D. Nev. Aug. 22, 2012 ...................... 11

*Harte-Hanks Comm'n v. Connaughton,*
  491 U.S. 657 (1989) ............................................................................... 23

*Henry v. Collins,*
  380 U.S. 356 (1965) ............................................................................... 23

*Hilton v. Hallmark Cards,*
  599 F. 3d 894 (9th Cir. 2009) ............................................................... 14

*Hoffman v. Capital Cities/ABC, Inc.,*
  255 F.3d 1180 (9th Cir. 2001) ............................................................... 24

*Hustler Magazine v. Falwell,*
  485 U.S. 46 (1988) ................................................................................. 22

*Las Vegas Sands Corp. v. First Cagayan Leisure & Resort Corp.,* No. 2:14-CV-424 JCM (NJK),
  2016 U.S. Dist. LEXIS 101028 (D. Nev. Aug. 2, 2016) ........................ 11

*Lothschuetz v. Carpenter,*
  898 F.2d 1200 (6th Cir.1990) ............................................................... 23

*M.G. v. Time Warner, Inc.,*
  89 Cal. App. 4th 623 (4th Dist. 2001) ................................................. 14

*Makaeff v. Trump Univ., LLC,*
  26 F. Supp. 3d 1002 (S.D. Cal. 2014) .................................................. 23

*Makaeff v. Trump Univ., LLC,*
  715 F.3d 254 (9th Cir. 2013) ............................................................... 24

*Masson v. New Yorker Magazine, Inc.,*
  501 U.S. 496 (1991) ............................................................................... 20

*McGarry v. University of San Diego,*
  154 Cal. App. 4th 97 (4th Dist. 2007) ................................................. 14

*Mendoza v. ADP Screening and Selection Services, Inc.,*
  182 Cal. App. 4th 1644 (2d Dist. 2010) .............................................. 14

*Mendoza v. Wichmann,*
  194 Cal. App. 4th 1430 (2011) ............................................................. 19

*Metabolife Int'l, Inc. v. Wornick,*
  264 F.3d 832 (9th Cir. 2001) ............................................................... 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

RANDAZZA | LEGAL GROUP

*New York Times v. Sullivan,*
  376 U.S. 254 (1964) ................................................................................ 1

*Nygard, Inc. v. Uusi-Kerttula,*
  159 Cal. App. 4th 1027 (2008) ............................................................... 13

*Packingham v. North Carolina,*
  582 U.S. __, 137 S. Ct. 1730 (2017) ...................................................... 16

*Pegasus v. Reno Newspapers, Inc.,*
  118 Nev. 706 (2002) ......................................................................... *passim*

*Pope v. Motel 6,*
  114 P.3d 277 (Nev. 2005) ....................................................................... 19

*Reader's Digest Assn. v. Superior Court,*
  690 P.2d 610 (Cal. 1984) ....................................................................... 24

*Resolute Forest Prods v. Greenpeace Int'l,*
  2017 U.S. Dist. LEXIS 170927 (N.D. Cal. Oct. 16, 2017) ..................... 27

*Rogers v. Home Shopping Netwk., Inc.,*
  57 F. Supp. 2d 973 (C.D. Cal. 1999) ...................................................... 11

*Rosenbloom v. Metromedia, Inc.,*
  403 U.S. 29 (1971) .................................................................................. 23

*S. Sutter, LLC v. LJ Sutter Partners, L.P.,*
  193 Cal. App. 4th 634 (2011) ................................................................. 19

*Sarver v. Chartier,*
  813 F.3d 891 (9th Cir. 2016) .................................................................. 13

*John v. Douglas County Sch. Dist.,*
  125 Nev. 746 (Nev. 2009).................................................................. 11, 12

*Seelig v. Infinity Broadcasting Corp.,*
  97 Cal. App. 4th 798 (1st Dist. 2002).................................................... 14

*Shapiro v. Welt,*
  389 P.3d 262 (Nev. 2017) ....................................................................... 12

*Sipple v. Foundation For Nat. Progress,*
  71 Cal. App. 4th 226 (2d Dis. 1999)...................................................... 14

*St. Amant v. Thompson,*
  390 U.S. 727 (1968)...........................................................................24, 25

*Stewart v. Rolling Stone LLC,*
  181 Cal. App. 4th 664 (1st Dist. 2010) .................................................. 14

*Tamkin v. CBS Broadcasting, Inc.,*
    193 Cal. App. 4th 133 (1st Dist. 2011) ........................................................... 14

*Taus v. Loftus,*
    40 Cal. 4th 683 (2007) ....................................................................................... 15

*Thomas v. Fry's Elecs., Inc.,*
    400 F.3d 1206 (9th Cir. 2005) ............................................................................ 13

*Underwager v. Channel 9 Australia,*
    69 F.3d 361 (9th Cir. 1995) ................................................................................ 23

*Welsh v. City and County of San Francisco,*
    887 F. Supp. 1293 (N.D. Cal. 1995) ................................................................ 23

*Wynn v. Chanos,*
    685 Fed. Appx. 578 (9th Cir.) ............................................................................ 28

*Wynn v. Chanos,*
    75 F. Supp. 3d 1228 (N.D. Cal. 2014) ......................................................... 3, 22, 27

*Wynn v. Smith,*
    117 Nev. 6, 9 (2001) ................................................................................... 3, 19, 22

**STATUTES**

Cal. Code Civ. Proc. § 425.16 ............................................................................ 12

NRS 41.635 ............................................................................................. 1, 2, 11, 13

NRS 41.637 ............................................................................................. 11, 13, 16

NRS 41.660 ............................................................................................... 1, 11, 12

NRS 41.665 ........................................................................................................ 12

NRS 41.670 ......................................................................................... 1, 2, 28, 29

**RULES**

Fed. R. Civ. P. 12 .............................................................................................. 26

Fed. R. Civ. P. 56 ....................................................................................... 12, 29

**DEFENDANTS LISA BLOOM AND THE BLOOM FIRM'S**
**SPECIAL MOTION TO DISMISS PURSUANT TO NRS 41.660**

In *New York Times v. Sullivan,* 376 U.S. 254, 270 (1964) the Supreme Court recognized our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." This core First Amendment principle requires that a public figure who brings a defamation claim must prove publication with "actual malice." In other words, the publisher must *know* the statement is false or have a reckless disregard for the truth. In order to give effect to *Sullivan* and its progeny, courts discharge their constitutional duty by resolving defamation cases early on. This Constitutional mandate is heightened in states where the substantive law of defamation is subject to an Anti-SLAPP law. Nevada is one such state.

Defendants Lisa Bloom and the Bloom Firm hereby file their Special Motion to Dismiss Pursuant to NRS 41.660 (the "Anti-SLAPP Motion"). In federal court, Anti-SLAPP motions are treated as motions for summary judgment invoking the substantive portions of the Nevada Anti-SLAPP Statute, NRS 41.635 *et seq.* Defendants request that the Court dismiss Plaintiff's claim with prejudice (granting summary judgment), award Defendants their costs and reasonable attorneys' fees incurred in defending themselves from Plaintiff's meritless suit, and award Defendants $10,000 in statutory damages pursuant to NRS 41.670(1)(b).

**MEMORANDUM OF POINTS AND AUTHORITIES**

**1.0    INTRODUCTION**

Steve Wynn is a world-famous public figure. In January 2018, his public image shifted from casino visionary to sexual predator. Wynn's legacy withered under the searing heat of numerous accusations of sexual harassment, abuse, and even rape. The national press covered these allegations, and Wynn quickly stepped down from management of properties bearing his name.

As these allegations broke and nationwide attention focused on them, Angelina Mullins, a professional dancer who performed in Wynn's ShowStoppers approached Defendants seeking legal representation against Wynn. She told Defendants about Wynn's pattern of sexually harassing female performers during ShowStoppers rehearsals. Ms. Mullins reported that Wynn required the

performers to strip down to their undergarments and dance for his personal gratification. Defendants thoroughly vetted the story by interviewing three eyewitnesses who all consistently and independently confirmed these events.[1]  Defendants then told Wynn's counsel about these allegations and asked them for comment before publishing the story.  They received no response and no refutation of any detail of the account.

Wynn only contested Ms. Mullins's story after Defendants received no response and published the details.  Even then, Defendants asked Wynn for any evidence or witnesses to demonstrate the factual inaccuracy of anything in the public statement.  Wynn refused to provide anything.  In his Complaint, Wynn denies the events in Ms. Mullins's account, but fails to state any viable cause of action.  Several of the statements in Defendants' press release are provably true, and there is no question that Defendants thoroughly vetted any contested statements and thus did not publish them with actual malice, which Wynn must show as a public figure.

Wynn is not trying to remediate any actual injury or vindicate his legal rights.  Rather, he is trying to silence his critics.  This is a Strategic Lawsuit Against Public Participation ("SLAPP" suit). The Nevada legislature created a **substantive immunity** from such lawsuits in the form of the Nevada Anti-SLAPP statute, NRS 41.635 *et seq.*  The statute is meant to stop weak suits based upon a defendant exercising her right to free speech before the defendant can be burdened with the expense of heavy litigation costs.  The Court should dismiss Plaintiff's claim with prejudice, award Defendants their costs and reasonable attorneys' fees incurred in defending themselves from this meritless suit, and impose a sanction of $10,000 on Plaintiff to deter him and other censorious plaintiffs from filing suits such as this.  *See* NRS 41.670.

## 2.0  FACTUAL BACKGROUND

### 2.1  Plaintiff's General Notoriety

Steve Wynn is a globally-famous casino mogul, and a quintessential public figure.  He "is well-known and recognized for his role in the revitalization of the Las Vegas Strip in the 1990s."

---

[1]  In contrast, the Washington Post ran the Watergate story with less confirmation than Ms. Bloom ran with hers.

(ECF No. 1 at ¶ 4.)  He "is the entrepreneurial figure behind many of Las Vegas's most distinctive resorts, including the Mirage, Treasure Island, Bellagio, Encore and Wynn Las Vegas."  (*Id.* at ¶ 5.)  Barron's Magazine recognized him "as one of the top 30 World's Best CEOs."  (*Id.* at ¶ 6.)  He has been "ranked 17th out of the world's best-performing CEOs by Harvard Business Review."  (*Id.* at ¶ 7.)  Forbes Magazine "recogniz[ed] him as one of the 100 Greatest Business Minds."  (*Id.* at ¶ 8.)  Wynn previously admitted to being a public figure.  *See Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1238 (N.D. Cal. 2014).  The Nevada Supreme Court described Wynn as "a well-known public figure in Nevada."  *Wynn v. Smith*, 117 Nev. 6, 9 (2001) (noting that since the "actual malice" standard for defamation was created, it "was extended to public figure plaintiffs, such as Wynn").

## 2.2    Wynn's Eyesight – A Red Herring Issue

Plaintiff alleges that Wynn was diagnosed in his 20s with a degenerative eye disease and "has been legally blind for almost two decades."  (ECF No. 1.)  This allegation, while perhaps accurate, does not mean much in the context of this case.  *Legal blindness* is not equivalent to *clinical blindness*.[3] There is no allegation in the Complaint that Wynn has *no* vision, or that he was incapable during the 2014 to 2016 run of ShowStoppers of seeing the show's dancers rehearse, especially when he sat close to the stage.  In fact, Wynn himself often talks about what he can see in video interviews, including "watching" ShowStoppers.  He also says he "sees" buildings and "sees" hotel plans.  (*See* declaration of Marcelino Valencap ["Valencap Decl."], attached as **Exhibit 2**, at ¶¶ 3-6.)[4]

---

[3]    "Legal blindness is a level of vision loss that has been legally defined to determine eligibility for benefits.  In the United States, this refers to a medically diagnosed central visual acuity of 20/200 or less in the better eye with the best possible correction, and/or a visual field of 20 degrees or less … Often, **people who are diagnosed with legal blindness still have some usable vision**."  "Key Definitions of Statistical Terms," American Foundation for the Blind (Aug. 2017), attached as **Exhibit 1**, available at: http://www.afb.org/info/blindness-statistics/key-definitions-of-statistical-terms/25 (last accessed May 9, 2018).

[4]    Mr. Wynn also has a reputation for collecting fine art, a visual medium.  He is able to describe those paintings in detail, based on what he says.  (*See* Valencap Decl. at ¶ 3(j).)  The art gallery at Wynn Palace states that "[r]espected throughout the world as an astute collector, our founder Steve Wynn gathered an exceptional selection of Western and Asian artworks chosen for display throughout Wynn Palace."  (*See* "The Art Collection at Wynn Palace" page at <wynnpalace.com>, attached as **Exhibit 3**, available at: https://www.wynnpalace.com/en/art-gallery (last accessed May 8, 2018).)  The Las Vegas Sun reported on some of Mr. Wynn's most well-known art purchases, and noted that as recently as July 2011 he purchased Chinese porcelain vases for almost $13 million.  (*See* Rebecca Clifford-Cruz, "7 of Steve Wynn's most notable art purchases," LAS VEGAS SUN (July 9, 2011), attached as **Exhibit 4**, available at: https://lasvegassun.com/news/2011/jul/09/seven-wynns-notable-art-purchases/ (last accessed May 10, 2018).)  Reporting on Mr. Wynn's art collection continued even after the flood of sexual abuse allegations against him started.

RANDAZZA | LEGAL GROUP

While Mr. Wynn's eyesight may be less than ideal, it is clear that he can still see. And in bringing this lawsuit, he is perhaps more like Oedipus – *lacking vision, but not eyesight*. However, at this stage of the proceedings, let us accept the *implication* that Wynn is as blind as Tiresias. It is still legally irrelevant. The question is whether Ms. Bloom knew, for a fact, that Wynn is so blind that he cannot see a scantily clad woman, or whether Ms. Bloom entertained serious doubts as to Wynn's complete blindness. Once there, we have only partially answered the question. The Court must then, by extension, find that Ms. Bloom entertained serious doubts as to the accounts of her *three* sources – when those sources shared stories that were consistent with each other and with reports already in the national media, and which had already caused Wynn to lose the leadership of his eponymous company. Given the high-profile reports of Wynn's misdeeds, along with his famed affinity for visual media, along with the three sources' consistent and reliable stories, the "Steve Wynn can't see anything" story appears to be false. Even if it is not, it is a red-herring. The fact is, Ms. Bloom can document that the story she wrote is true. Even if it is not, she entertained no doubts as to the truth, much less *serious* doubts. As a result, Wynn will never be able to show the requisite facts or fault to overcome the actual malice standard – which requires a public figure to prove actual malice by clear and convincing evidence.

### 2.3    Wynn's Notoriety as a Sexual Abuser – The Real Issue

In January 2018, The Wall Street Journal ("WSJ") published an article "accusing Mr. Wynn of a decade-long pattern of sexual misconduct." (ECF No. 1 at ¶ 9.) The article recounted accusations of Wynn forcing married women to have sex with him (entering into a $7.5 million settlement agreement with at least one woman), pressuring employees into having sex with him in confined spaces shared with German shepherds, and Wynn creating a general sense of terror among his employees by using his wealth and influence to create an atmosphere where they felt they would suffer severe consequences if they did not accede to his sexual demands. (*See* Alexandra Berzon,

---

(*See* Philip Conneller, "Steve Wynn Selling Art Worth $150 Million, Picassos and Warhol Up for Auction," CASINO.ORG (Apr. 10, 2018), attached as **Exhibit 5**, available at: https://www.casino.org/news/steve-wynn-selling-art-worth-150-million-picassos-and-warhol-up-for-auction (last accessed May 8, 2018).)

et al., "Dozens of People Recount Pattern of Sexual Misconduct by Las Vegas Mogul Steve Wynn," THE WALL STREET JOURNAL (Jan. 27, 2018), attached as **Exhibit 6**.)[9]  Some of Wynn's female employees told the WSJ that they would hide in the bathroom or back rooms when he came to their work area – to avoid being *seen* by him.  *See id.*

"After the publication of the January 26 *Journal* article, Wynn became a multi-billionaire target of a media and legal frenzy of … accusations, including … accusations of rape."[10]  (ECF No. 1 at ¶ 11.)  Indeed, following the WSJ's article, a slew of stories came out discussing new allegations of Wynn's sexual misconduct.  The Las Vegas Review-Journal ("RJ") reported on allegations in a federal lawsuit accusing Wynn of sexual misconduct, including giving the impression that a waitress at the Mirage casino would lose her job if she did not have sex with him.  (*See* Arthur Kane and Rachel Crosby, "Las Vegas court filing: Wynn wanted sex with waitress 'to see how it feels' to be with a grandmother," LAS VEGAS REVIEW-JOURNAL (Feb. 5, 2018), attached as **Exhibit 7**.)[11]  The Associated Press ("AP") reported on allegations in police reports to Las Vegas police accusing Wynn of multiple acts of rape going as far back as the 1970s.  (*See* Regina Garcia Cano, "APNewsBreak: Woman tells police Steve Wynn raped her in '70s," ASSOCIATED PRESS (Feb. 28, 2018), attached as **Exhibit 8**.)[12]

An RJ article covered a lawsuit filed by a former massage therapist against Wynn, "alleging that he frequently used 'his immense power to coerce [her] to perform sexual favors.'"  (*See* David Ferrara, "Massage therapist sues Steve Wynn alleging sexual harassment," LAS VEGAS REVIEW-JOURNAL (Feb. 28, 2018), attached as **Exhibit 9**.)[13]  It then covered a second lawsuit shortly thereafter by another massage therapist making similar allegations, including an allegation that Wynn

---

[9]    Available at:  https://www.wsj.com/articles/dozens-of-people-recount-pattern-of-sexual-misconduct-by-las-vegas-mogul-steve-wynn-1516985953 (last accessed May 10, 2018).

[10]    Wynn alleges these accusations are false, and has publicly stated his ex-wife is behind them.  Defendants are not willing to give Wynn the benefit of the doubt.

[11]    Available at:  https://www.reviewjournal.com/news/las-vegas-court-filing-wynn-wanted-sex-with-waitress-to-see-how-it-feels-to-be-with-a-grandmother/ (last accessed May 10, 2018).

[12]    Available at:  https://www.apnews.com/d74af8c7df2c4f70ae156b82207109ef (last accessed May 10, 2018).

[13]    Available at:  https://www.reviewjournal.com/business/casinos-gaming/massage-therapist-sues-steve-wynn-alleging-sexual-harassment/ (last accessed May 10, 2018 ).

RANDAZZA | LEGAL GROUP

forced her to have sex with him dozens of times over the course of three years.  (*See* David Ferrara, "Second massage therapist files lawsuit against Steve Wynn," LAS VEGAS REVIEW-JOURNAL (Mar. 1, 2018), attached as **Exhibit 10**.)[14]  The Nevada Independent then reported a third lawsuit by a nail technician against Wynn, in which the plaintiff accused Wynn of pressuring her into unwanted sexual contact and threatening to fire or harm her if she refused.  (*See* Michelle Rindels, et al., "Manicurist alleges Steve Wynn committed sexual misconduct, demanded employees record videos denying he assaulted them," THE NEVADA INDEPENDENT (Mar. 6, 2018), attached as **Exhibit 11**.)[15]

Amidst these accusations, Wynn resigned as Chairman and CEO of Wynn Resorts.  (*See* Maggie Astor and Julie Creswell, "Steve Wynn resigns From Company Amid Sexual Misconduct Allegations," THE NEW YORK TIMES (Feb. 6, 2018), attached as **Exhibit 12**.)[16]  Shortly after the first allegations of harassment broke, he also stepped down as the Finance Chairman for the Republican National Committee.  (*See* Emily Cochrane and Kenneth P. Vogel, "Stephen Wynn Steps Down From R.N.C. Post After Sexual Misconduct Claims," THE NEW YORK TIMES (Jan. 27, 2018), attached as **Exhibit 13**.)[17]  Less than a week after the first of the allegations against Wynn broke, the Nevada Gaming Control Board launched an investigation into Wynn's misconduct.  (*See* Khalon Richard, "After Sexual Misconduct Claims, Vegas Mogul Steve Wynn Fell Fast," National Public Radio (Mar. 15, 2018), attached as **Exhibit 14**.)[18]  The fallout from these allegations against Wynn were of such public interest that the RJ published an article detailing the reactions of Wynn's accusers to his resignation from Wynn resorts.  (*See* Ramona Giwargis, et al., "Women who alleged sexual harassment by Steve Wynn react to his resignation," LAS VEGAS REVIEW-JOURNAL (Feb. 7,

---

[14]    Available at: https://www.reviewjournal.com/business/casinos-gaming/second-massage-therapist-files-lawsuit-against-steve-wynn/ (last accessed May 10, 2018).

[15]    Available at: https://thenevadaindependent.com/article/manicurist-alleges-steve-wynn-committed-sexual-misconduct-demanded-employees-record-videos-denying-he-assaulted-them (last accessed May 10, 2018).

[16]    Available at: https://www.nytimes.com/2018/02/06/business/steve-wynn-resigns.html (last accessed May 10, 2018).

[17]    Available at: https://www.nytimes.com/2018/01/27/us/politics/steve-wynn-rnc-resignation.html (last accessed May 10, 2018).

[18]    Available at: https://www.npr.org/2018/03/15/592318034/after-sexual-misconduct-claims-vegas-mogul-steve-wynn-fell-fast (last accessed May 10, 2018).

RANDAZZA | LEGAL GROUP

2018), attached as **Exhibit 15**.)[19]   As all of the above media coverage shows, the allegations against Wynn and the subsequent fallout received significant nationwide attention.   All of this national attention, reported on by reputable news publications, and subject to official investigations, came before Defendants' publication.

With all of this reliable press coverage in reputable publications, Defendants would have had no duty to independently vet any statements made by Angelina Mullins – whose story they told in their press release.   Had Defendants simply published at this point, no defamation claim based on the statements made would get past the actual malice standard.   However, Defendants went above and beyond – vetting the statements at a level that went beyond what even the most cautious newsroom editor would insist upon – with three independent sources.   Ben Bradlee would have been proud to green light the story.

### 2.4   Defendants' Vetting Before Publication & Evidentiary Support for the Statements

Following the January 2018 WSJ story, Defendants received several calls from individuals wishing to sue Wynn for sexual harassment and other misconduct.   (*See* Declaration of Lisa Bloom ["Bloom Decl."], attached as **Exhibit 16**, at ¶ 3.)   Defendants investigated the validity of these claims and declined to represent individuals whose claims were uncorroborated, time barred, or lacked credibility.   (*See id.* at ¶ 4.)

While vetting potential clients, Defendants interviewed Angelina Mullins,[20] a dancer who performed in "Showstoppers" from 2014 to 2016.   (*See* Declaration of Angelina Mullins ["Mullins Decl."], attached as **Exhibit 17**, at ¶ 3.)   ShowStoppers was a dance show at the Encore Theater in Las Vegas, Nevada that ran from 2014 to 2016 and received "rave reviews," was created by Emmy-award winning choreographers and musical directors, and featured acclaimed Broadway stars.   (*See*

---

[19]   Available   at:   https://www.reviewjournal.com/business/casinos-gaming/women-who-alleged-sexual-harassment-by-steve-wynn-react-to-his-resignation/ (last accessed May 10, 2018).

[20]   Ms. Bloom has written consent from Ms. Mullins to reveal the specific information discussed in her declaration.

1  ECF No. 1 at ¶¶ 43-44, 56-57.)   It was not a nude or semi-nude show.  (*See* Mullins Decl. at ¶ 4.)

2  Wynn attended ShowStoppers rehearsals.  (*See* ECF No. 1 at ¶¶ 45-53.)

3       Ms. Mullins informed Defendants that when Wynn attended ShowStoppers rehearsals, a

4  man named Richard Gray, who she believed was Wynn's right-hand man and she believed was

5  acting at Wynn's direction, would tell the show's choreographer, Marguerite Derricks, that Wynn

6  would be attending.  (*See* Mullins Decl. at ¶ 5.)  She told Defendants that Ms. Derricks would then

7  stop the rehearsal, tell the dancers Wynn was coming, and instruct every female member of the cast

8  to strip down to bras and panties, put on heels, and apply extra makeup to make themselves more

9  sexually appealing to Wynn.  (*See id.*)  Wynn then sat in the front row of the theater and looked at

10  the dancers in a manner that suggested to Ms. Mullins that these private shows for Wynn were

11  intended to sexually please him.  (*See id.* at ¶ 6.)  She was under the impression that Derricks and

12  Gray gave these instructions to the female dancers for Wynn's benefit and at his instruction.  (*See id.*

13  at ¶¶ 5, 9 .)  The dancers were instructed to hold Wynn's focus if Wynn made eye contact with them

14  during these private shows.  (*See id.* at ¶ 7.)  Ms. Mullins found these demands to be unprofessional

15  and demeaning, and would often not comply with them.  (*See id.* at ¶ 8.)  Since she refused to strip

16  down and present herself for Wynn's sexual gratification, Ms. Derricks pushed Ms. Mullins to the

17  sides or the back of dances so that she would be seen less prominently by the audience, and would

18  sometimes remove Ms. Mullins from dances altogether.  (*See id.* at ¶ 9.)

19       After being told this story by Ms. Mullins, Defendants vetted the facts by contacting other

20  witnesses – two of whom were also ShowStoppers cast members.  They interviewed Colt Prattes,[21] a

21  male dancer who confirmed that Ms. Mullins gave him the same account, and that the harassment

22  and retaliation she suffered caused severe mental strain.  (*See* Declaration of Colt Prattes ["Prattes

23  Decl."], attached as **Exhibit 18**, at ¶¶ 3-7.)  Samuel Cahn-Temes, another male dancer who

24  performed in ShowStoppers, was an eyewitness to Ms. Mullins's account.  He confirmed that before

25  Wynn arrived at rehearsals, female dancers (and only female dancers) were expected to strip down to

26

27     [21]  Mr. Prattes is Ms. Mullins's husband.

bras and panties, apply makeup, wear heels, and dance the most revealing numbers in the show – all to satisfy Wynn.  (*See* Declaration of Samuel Cahn-Temes ["Cahn-Temes Declaration"], attached as **Exhibit 19**, at ¶¶ 3-5.)  Cahn-Temes told Defendants that he was shocked and disgusted by these requirements, and that other cast members told him they felt like animals at a zoo.  (*See id.* at ¶ 6.)  He confirmed that Ms. Derricks retaliated against Ms. Mullins when she refused to strip for Wynn by minimizing her stage time or excluding her altogether.  (*See id.* at ¶ 9.)

Finally, Defendants interviewed Lauren Molina, a female ShowStoppers performer who was let go from the show for speaking up about poor working conditions.  (*See* Declaration of Lauren Molina ["Molina Decl."], attached as **Exhibit 20**, at ¶¶ 3-5.)  She confirmed Ms. Mullins's account that performers who spoke up about working conditions suffered retaliation.  (*See id.*)  She confirmed that when Wynn came to a ShowStoppers rehearsal, all female cast members were expected to dress sexier, including bras as the expected top and either booty shorts, tight pants, or dance briefs for bottoms;[22] that female dancers were expected to put on make-up and wear high heels; and they were required to perform routines with sexier dancing for Wynn.  (*See id.* at ¶¶ 6-10.)  She also corroborated Ms. Mullins's understanding that, while Derricks and Gray were the ones who communicated these lewd expectations, they came directly from Mr. Wynn himself.  (*See id.*)  Ms. Molina met with Wynn during the course of her time with ShowStoppers, during which he inappropriately commented on her appearance multiple times.  (*Id.* at ¶¶ 11.)  Ms. Molina relayed to Defendants a comment from another singer that Ms. Derricks told the singer that Wynn's only regret with ShowStoppers was that there wasn't more "'bouncing with the women.'"  (*Id.* at ¶ 12.)

### 2.5   Defendants' Statements

After vetting Ms. Mullins's story, Defendants sent Wynn's counsel a demand letter stating that Ms. Mullins was prepared to bring a case against Wynn for sexual misconduct during ShowStoppers rehearsals.  (*See* ECF No. 1 at ¶ 12; *see also* March 13, 2018 demand letter, attached as

---

[22]   Ms. Molina was only part of the ShowStoppers cast from October 2014 to November 2014.  (*See id.* at ¶ 3.)  Thus, her reference to booty shorts as the expected bottom for the Wynn rehearsals as opposed to panties did not make Ms. Mullins's account of events any less plausible.

RANDAZZA | LEGAL GROUP

**Exhibit 21**.)  Wynn did not respond nor did he deny any of Ms. Mullins's allegations.  (*See* ECF No. 1 at ¶ 13; *see also* Bloom Decl. at ¶ 11.)  This silence was odd to Defendants, given that Wynn's counsel quickly responded to a prior demand sent by Defendants in February, related to another woman accusing Wynn of sexual misconduct.  (*See* Bloom Decl. at ¶ 12.)  During a conversation with Wynn's counsel related to this other matter, Ms. Bloom asked Wynn's counsel what their response was to the Mullins demand letter.  (*See id.* at ¶ 12.)  Wynn's counsel responded by saying they had no response, and once again did not state that any allegation in the Mullins demand letter was inaccurate.  (*See id.* at ¶ 12.)  Thus, with two formal opportunities to deny the story, Wynn remained silent.

After vetting and corroborating Ms. Mullins's story, informing Wynn of Ms. Mullins's allegations, and receiving no denial in writing or in person with Wynn's counsel, Defendants published their initial press release telling Ms. Mullins's story.  Like many women in the #MeToo movement, and like the many women who had already spoken out about Wynn's conduct, Ms. Mullins wanted to tell her story.  Defendants were willing to assist by putting out a written press statement.  (*See* ECF No. 1-1; *see also* Bloom Decl. at ¶ 13.)  Only then did Wynn, for the first time, deny Ms. Mullin's story.  He sent Defendants a retraction demand on March 23, 2018.  (ECF No. 1-2.)  Defendants responded to this demand on March 27, 2018, pointing out that Wynn agreed to a number of the factual contentions in the March 22 press release, that Wynn claiming he is "legally blind" does not preclude him from leering at women, that Wynn's allegation of acute blindness is not credible in light of his habit of collecting fine art (a visual medium), that Ms. Mullins reasonably believed her supervisors at ShowStoppers rehearsals were taking orders directly from Wynn, that Defendants had eyewitnesses to corroborate Ms. Mullins's account, and that Defendants would be willing to issue a retraction if provided with evidence that any particular statement was false.  (*See* March 27, 2018 letter to Wynn's counsel, attached as **Exhibit 22**.)  Despite Defendants' multiple requests and willingness to clarify the record if an error had been made, Wynn provided no such evidence (ECF No. 1-3, 1-4), relying solely on conclusory statements from his attorney.  Nevertheless, in a show of good faith to remove even the faintest degree of uncertainty, Defendants

issued a subsequent press release on April 5, 2018 clarifying that it was a supervisor acting at Wynn's direction, rather than Wynn directly himself, who instructed Ms. Mullins and other female dancers to strip down to bras and panties during ShowStoppers rehearsals for Wynn's sexual gratification. (*See* April 5, 2018 press release, attached as **Exhibit 23**.)   While this is a distinction without a difference, Ms. Bloom honored the distinction in the interest of full and complete accuracy.

## 3.0   LEGAL STANDARDS

### 3.1   The Anti-SLAPP Statute

Under Nevada's Anti-SLAPP statute, NRS 41.635 *et. seq.*, if a lawsuit is brought against a defendant for exercising their First Amendment rights, the defendant has substantive immunity from suit unless the plaintiff can meet the statute's burden.  Evaluating the Anti-SLAPP motion is a two-step process.  The Movant bears the burden on the first step, and the Non-Moving party bears the burden on the second.  *See John v. Douglas County Sch. Dist.*, 125 Nev. 746, 754 (Nev. 2009).

First, the defendant must show, by a preponderance of the evidence, that the plaintiff's claim is "based upon a good faith communication in furtherance of the right to petition or the right to free speech in direct connection with an issue of public concern."  NRS 41.660(3)(a).  One of the specific statutory categories of protected speech is "[c]ommunication[s] made in direct connection with an issue of public interest in a place open to the public or in a public forum, which is truthful or is made without knowledge of its falsehood."  NRS 41.637(4).

Once the defendant meets its burden on the first prong, the burden then shifts to the plaintiff, which must make a sufficient evidentiary showing that it has a probability of prevailing on its claim.  NRS 41.660(3)(b); *see also John*, 125 Nev. at 754.

Federal courts treat Anti-SLAPP motions as a motion for summary judgment.  *See Haack v. City of Carson City*, No. 3:11-cv-00353-RAM, 2012 U.S. Dist. LEXIS 120137, at *9 (D. Nev. Aug. 22, 2012); *Las Vegas Sands Corp. v. First Cagayan Leisure & Resort Corp.*, No. 2:14-CV-424 JCM (NJK), 2016 U.S. Dist. LEXIS 101028, at *6 (D. Nev. Aug. 2, 2016) (stating "[a]lthough called a 'motion to dismiss,' anti-SLAPP motions are treated like motions for summary judgment"); *Rogers v. Home Shopping Netwk., Inc.*, 57 F. Supp. 2d 973 (C.D. Cal. 1999) (same).

Due to a dearth of case law applying Nevada's Anti-SLAPP statute, Nevada courts look to case law applying California's Anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16, which shares many similarities with Nevada's law.  *See John*, 125 Nev. at 756 (stating that "we consider California case law because California's anti-SLAPP statute is similar in purpose and language to Nevada's anti-SLAPP statute"); *see also Shapiro v. Welt*, 389 P.3d 262, 268 (Nev. 2017) (same); *and see* NRS 41.665(2) (defining the plaintiff's *prima facie* evidentiary burden in terms of California law.)[23]

Whether under Anti-SLAPP or Fed. R. Civ. P. 56, courts should dispose of meritless cases implicating protected speech early.  "[B]ecause unnecessarily protracted litigation would have a chilling effect upon the exercise of First Amendment rights, speedy resolution of cases involving free speech is desirable." *Good Government Group, Inc. v. Superior Court of Los Angeles County*, 22 Cal.3d 672, 685, 586 P.2d 572, 578 (Cal. 1978) *citing Dombrowski v. Pfister*, 380 U.S. 479, 486-487 (1965).

Thus, summary judgment is deemed to be a "favored" remedy in defamation cases. Summary judgment is particularly appropriate in cases involving free speech rights.  "Were not summary judgment granted in proper cases, the threat of protracted litigation might have a chilling effect upon the full and free exercise of the First Amendment …." *Brudvick v. Minor*, 2006 US. Dist. LEXIS 51608, *63 (D. Colo. July 13, 2006) (citations omitted).

## 4.0   ARGUMENT

### 4.1   NRS 41.660 Applies in Federal Court

The substantive portions of Anti-SLAPP statutes apply to state-law claims brought in federal court, as they create a substantive immunity to suit for defendants under certain circumstances.  *See Batzel v. Smith*, 333 F.3d 1018, 1025-26 (9th Cir. 2003); *see also Thomas v. Fry's Elecs., Inc.*, 400 F.3d

---

[23]   The Nevada Legislature specifically provides for California Anti-SLAPP jurisprudence to serve as the basis for interpreting Nevada's Anti-SLAPP law:

When a plaintiff must demonstrate a probability of success of prevailing on a claim pursuant to NRS 41.660, the Legislature intends that in determining whether the plaintiff "has demonstrated with prima facie evidence a probability of prevailing on the claim" the plaintiff must meet the same burden of proof that a plaintiff has been required to meet pursuant to California's anti-Strategic Lawsuits Against Public Participation law as of the effective date of this act.

RANDAZZA | LEGAL GROUP

1206, 1207 (9th Cir. 2005).  NRS 41.650 provides that a person who engages in conduct protected under Nevada's Anti-SLAPP statute "is **immune from any civil action** for claims based upon the communication" (emphasis added).  NRS 41.635-670 provides immunity from certain categories of lawsuits. This immunity is substantive in nature and applies in federal court, as does the fee-shifting portion of the statute.[24]

## 4.2     Prong One: This Suit is Based Upon Protected Conduct

NRS 41.637 provides four categories of protected conduct.  As relevant here, the statute protects any "[c]ommunication made in direct connection with an issue of public interest in a place open to the public or in a public forum … which is truthful or is made without knowledge of its falsehood."  NRS 41.637(4).  A defendant therefore must make three showings to satisfy this first prong: (1) the claims are based upon communications made in direct connection with an issue of public interest; (2) the communications were made in a place open to the public or in a public forum; and (3) the communications are truthful or were made without knowledge of their falsehood. All three requirements are met here.

### 4.2.1     Definition of Issue of Public Interest

The term "issue of public interest" for Anti-SLAPP purposes is defined broadly as "any issue in which the public is interested."  *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (2008).  "The issue need not be 'significant' to be protected by the anti-slapp statute – it is enough that it is one in which the public takes an interest."  *Id.*  "Although matters of public interest include legislative and governmental activities, they may also include activities that involve private persons and entities, **especially when a large, powerful organization may impact the lives of many individuals**."  *See Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 650 (1996) (emphasis added).  An activity does not need to "meet the lofty standard of pertaining to the heart

---

[24]    In contrast, the procedural portions of the Anti-SLAPP statute do not apply.  For example, the 60-day deadline for filing such motions does not apply.  *See Sarver v. Chartier*, 813 F.3d 891, 900 (9th Cir. 2016) (finding Anti-SLAPP motion filed after 60-day time limit under California law was timely in federal court).  The statute's automatic stay of discovery also does not apply in federal court.  *See Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 845-46 (9th Cir. 2001).

RANDAZZA | LEGAL GROUP

of self-government" to qualify for Anti-SLAPP protection; "social or even low-brow topics may suffice." *Hilton v. Hallmark Cards*, 599 F. 3d 894, 905 (9th Cir. 2009).  A radio discussion about a reality television show and the creation of a CSI episode have been found to be matters of public interest for Anti-SLAPP purposes.  *See Seelig v. Infinity Broadcasting Corp.*, 97 Cal. App. 4th 798, 807 (1st Dist. 2002); *see also Tamkin v. CBS Broadcasting, Inc.*, 193 Cal. App. 4th 133, 144 (1st Dist. 2011).

The lifestyles and general conduct of well-known public figures and celebrities constitute an issue of public interest.  *See Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2011) (celebrity Paris Hilton acknowledging that her "privileged lifestyle and her catchphrase ('that's hot') are matters of widespread public interest").  "[T]here is a public interest which attaches to people who, by their accomplishments, mode of living, professional standing or calling, create a legitimate and widespread attention to their activities." *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 667-68 (1st Dist. 2010).  A California court found that a libel action by a former head football coach was subject to the Anti-SLAPP statute because the plaintiff's "role as head coach of a local university's football team already made him a public figure, and his employment termination was already a topic of widespread public interest." *McGarry v. University of San Diego*, 154 Cal. App. 4th 97, 110 (4th Dist. 2007).  Issues that involve even nominally private conduct by public figures may be an issue of public interest.  *See Sipple v. Foundation For Nat. Progress*, 71 Cal. App. 4th 226, 238 (2d Dis. 1999) (finding that lawsuit based on reported allegations against nationally prominent media strategist for political figures, accusing him of physically and verbally abusing his wife, involved a matter of public interest).

Even low-level or non-news-frenzy sexual misconduct can be an issue of public interest.  The court in *Mendoza v. ADP Screening and Selection Services, Inc.*, 182 Cal. App. 4th 1644, 1653 (2d Dist. 2010) determined that the public has a "strong interest in the dissemination of information regarding registered sex offenders" in a suit involving background checks for sex offenders.  The court in *M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623, 629 (4th Dist. 2001) found that an article concerning the issue of adult coaches who sexually molest youths playing team sports was of

significant public interest.  Certainly a case like this, which has garnered global media attention, is of greater public interest than any of the above examples.

Finally, the merits of a plaintiff's claims, and the legality of the defendant's actions, are not the focus of the first prong analysis and, if relevant, should only be considered during the second prong analysis.  *See Coretronic Corp. v. Cozen O'Connor*, 192 Cal. App. 4th 1381, 1388 (2d Dist. 2011); *see also Taus v. Loftus*, 40 Cal. 4th 683, 706-07, 713, 727-29 (2007).

### 4.2.2   Defendants' Statements Were Made in Direct Connection with an Issue of Public Interest

Plaintiff's cause of action for defamation is based upon Defendants' published statements. These statements relate directly to a significant issue of public interest, namely a pattern of allegations of sexual harassment against a public figure – and in the context of heavy media attention upon those allegations in the midst of the worldwide #MeToo movement.  For months prior to publication of Defendants' allegedly defamatory statements, Wynn was accused of heinous sexual misconduct, including rape and abuse of his wealth and power to pressure women into having sex with him.  (*See* **Exhibits 6-11**.)  Plaintiff explicitly recognizes that there was a public controversy starting at least in January 2018 regarding his alleged sexual misconduct, and he publicly participated in this dispute.  (*See* ECF No. 1 at ¶¶ 9-10.)  He then "became a multi-billionaire target of a media and legal frenzy" of allegations of sexual misconduct.  (*See id.* at ¶ 11.)  Furthermore, as his own complaint shows, Plaintiff is a public figure and was one long before the allegations of sexual misconduct.  (*See* ECF No. 1 at ¶¶ 4-8).

Defendants' statements recount a sustained pattern of sexual misconduct and harassment towards both Ms. Mullins and other female dancers.  The statements are related to the public issue of a swarm of allegations of sexual misconduct by Steve Wynn.  This dispute existed months before Defendants' statements, and Wynn had already entered the arena of public discussion by publicly denying the allegations and blaming them on his ex-wife.  Defendants' statements also relate to the trend over the past year of women coming forward to share their stories of sexual abuse at the hands of prominent, powerful, and (previously) well-regarded men such as Bill Cosby and Bill

O'Reilly, known as the #MeToo movement.  Wynn is yet another data point in this pattern of powerful men abusing their wealth and position of authority, further solidifying the relationship between Defendants' statements and an issue of public interest.  Wynn's claims arise from conduct protected by the Anti-SLAPP statute.

### 4.2.3   Defendants' Statements Were Made in a Place Open to the Public or a Public Forum

Defendants published their press releases on the web sites <facebook.com> and <twitter.com>, and also sent the press releases to a media list for publication.  (*See* Bloom Decl. at ¶ 13.)  Publicly accessible web sites are public forums for Anti-SLAPP purposes.  *See Cole v. Patricia A. Meyer & Associates*, 206 Cal. App. 4th 1095, 1121 (2012).  In fact, the U.S. Supreme Court recognized that social media web sites such as Facebook and Twitter are paradigmatic modern day public forums.  *See Packingham v. North Carolina*, 582 U.S. __, 137 S. Ct. 1730, 1735-37 (2017) (noting that "[s]ocial media offers relatively unlimited, low-cost capacity for communication of all kinds" and that "social media users employ these websites to engage in a wide array of protected First Amendment activity on topics as diverse as human thought").  There is no question that Defendants' statements in direct connection with a matter of public interest were made in a place open to the public or a public forum.

### 4.2.4   Defendants' Statements Were Made in Good Faith

To be protected under the Anti-SLAPP statute, statements must be "truthful or … made without knowledge of [their] falsehood."  NRS 41.637.  Even if a statement is false, the defendant must have made it with *actual knowledge* that it was false; neither negligence nor even reckless disregard for the truth can defeat a defendant's showing under prong one (prong two may be another story).  Furthermore, by the Anti-SLAPP statute's plain language, the "good faith" analysis is completely unrelated to a defendant's motivations in making a statement.

As detailed in Sections 2.4 and 2.5, *supra*, Defendants did not make any statement with actual knowledge that any statement was false.  Defendants thoroughly (in fact, more than thoroughly) vetted Ms. Mullins's story.  Specifically, Defendants learned that Wynn, through his subordinates

and his right-hand man, (1) attended rehearsals for ShowStoppers, a show that was not nude or semi-nude; (2) ordered that the female performers strip down to more revealing clothing, including bras, panties, and/or "booty shorts," wear high heels, and wear additional makeup to make themselves more sexually appealing; (3) ordered that the stripped-down female performers dance the more revealing routines from ShowStoppers to Wynn while he looked on, for his sexual gratification; and (4) female dancers who did not comply with these orders, such as Ms. Mullins, were retaliated against by reducing their involvement and prominence in the show's routines. (Mullins Decl. at ¶¶ 3-10.)  Defendants then interviewed three eye witnesses who corroborated the details of Ms. Mullins's story.  (*See* Prattes Decl. at ¶¶ 3-7; Cahn-Temes Decl. at ¶¶ 3-10; Molina Decl. at ¶¶ 3-12.)  Defendants sent a demand letter to Wynn's counsel relaying these allegations on March 13, 2018, received no response, directly asked Wynn's counsel about them again and received no denial, and then published their initial press release on March 22, 2018.  (*See* Bloom Decl. at ¶¶ 10-13; *see also* ECF No. 1-1.).

Wynn generally claims that all aspects of Ms. Mullins's story are false.  Defendants disagree, but the truth of the statements are of secondary importance at this stage.  The only arguments Wynn provides to support his position that Ms. Bloom must have known her statements were false are that (1) Defendants knew Wynn was legally blind during the run of ShowStoppers, and (2) the initial press release was worded in a way to imply that Wynn personally instructed the dancers to strip down and personally retaliated against Mullins for refusing to do so.

The first contention is easily dispensed with.  Wynn is not clinically blind, meaning he retains some measure of visual acuity, and Wynn does not allege that he was ever incapable of seeing the rehearsals.  Rather, Wynn simply references his "blindness" to give this impression without actually explaining what his alleged blindness means.  Wynn also provides no evidentiary support for his allegation that Defendants knew of this alleged blindness.  Meanwhile, Wynn talks frequently in interviews about what he sees, and he collects fine art, a visual medium, which strongly suggests that he has usable eyesight.  (*See* **Exhibits 3-5**; *see also* Valencap Decl. at ¶¶ 3-6.)  There is no suggestion of how an allegation of "legal blindness," with no further elaboration, is sufficient to discredit the

RANDAZZA | LEGAL GROUP

testimony of Ms. Mullins and Defendants' eyewitnesses – especially in light of the fact that her story was widely corroborated, and Wynn has never challenged publications discussing his affinity for the visual arts.

The second contention has no application here.  The initial press release states that "the female dancers were instructed immediately to strip down," and that Ms. Mullins's refusals to strip down "were followed by her being sent to the back of dance routines, or removed from show routines altogether."  (ECF No. 1-1.)  Putting aside the question of whether a showing of good faith under the Anti-SLAPP statute can be defeated by an allegation of creating a false implication, rather than an actually false statement, there is no knowing falsity.  Whether Wynn *personally* said to dancers "strip for me!" upon his arrival at ShowStoppers rehearsals and *personally* made changes to dance routines to retaliate against Ms. Mullins, or if he simply had his subordinates do so for him, the meaning is the same: Ms. Mullins was ordered to strip down at Wynn's request, while in his employ, and for his benefit, and was retaliated against when she failed to do so.  Whether Wynn used his own voice to orchestrate this, or did so through agents, is legally irrelevant.

After interviewing Ms. Mullins and other ShowStoppers performers, there was simply no way for Defendants to interpret their accounts as meaning anything other than Mr. Wynn being behind the sexual harassment of female ShowStoppers performers.  Defendants did not and could not have made any statement with knowing falsity.  And in an effort to be as granularly accurate as possible, Defendants issued a corrective press statement, on the same day of the week, and in the same manner as the original, clarifying that it was not Wynn himself who personally ordered the stripping.  (*See* Bloom Decl. at ¶ 16; *see also* **Exhibit 23**.)

Defendants thus satisfy their burden under the first prong of the Anti-SLAPP analysis.  The burden now shifts to Wynn to show a probability of prevailing on his claim for defamation.

### 4.3     Plaintiff Cannot Show a Probability of Prevailing on His Claim

NRS 41.660 defines a plaintiff's burden of proof as "the same burden of proof that a plaintiff has been required to meet pursuant to California's anti-Strategic Lawsuit Against Public Participation law as of the effective date of this act."  NRS 41.665(2).  Plaintiff cannot simply make

vague accusations or provide a mere scintilla of evidence to defeat Defendants' motion.  Rather, to satisfy his evidentiary burden under the second prong of the Anti-SLAPP statute, Plaintiff must present "substantial evidence that would support a judgment of relief made in the plaintiff's favor." *S. Sutter, LLC v. LJ Sutter Partners, L.P.*, 193 Cal. App. 4th 634, 670 (2011); *see also Mendoza v. Wichmann*, 194 Cal. App. 4th 1430, 1449 (2011) (holding that "substantial evidence" of lack of probable cause was required to withstand Anti-SLAPP motion on malicious prosecution claim.) Plaintiff cannot make this showing as to his sole cause of action for defamation.

To establish a cause of action for defamation, a plaintiff must allege: (1) a false and defamatory statement by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages. *See Wynn v. Smith*, 117 Nev. 6, 10 (Nev. 2001); *see* also *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 718 (2002).  A statement is only defamatory if it contains a factual assertion that can be proven false. *See Pope v. Motel 6*, 114 P.3d 277, 282 (Nev. 2005).

### 4.3.1   Defendants' Statements are True or Substantially True

First, it is important to define precisely what statements are allegedly defamatory here. Wynn's Complaint complains of the following statements:

    a.  The headline: "**NEW WOMAN ACCUSES STEVE WYNN OF SEXUAL HARASSMENT VIA HER ATTORNEY, LISA BLOOM**";

    b.  "I represent a woman alleging sexual harassment and retaliation against Steve Wynn";

    c.  "Yet when Mr. Wynn stopped in to the rehearsals, which he did often when he was in town, the female dancers were instructed immediately to strip down to bras and panties, put on heels, and apply extra makeup so as to be sexually appealing to Mr. Wynn;[25]

---

[25]   It is worth noting that, despite attaching the press release as an exhibit, Mr. Wynn's Complaint misrepresents the contents.  The Complaint gives the impression that Defendants made these statements and adopted them in full as if they were asserting the truth of the statements on personal knowledge.  However, the press release explicitly states that it recounts **Ms. Mullins's** story by stating in the first paragraph "[h]ere is her story."  (ECF No. 1-1.)

RANDAZZA | LEGAL GROUP

d.  "Mr. Wynn would then sit in the front row of the theater and leer while the female performers danced particularly physically revealing segments of the show";

e.  "Many cast members, including my client, considered Mr. Wynn's demands humiliating";

f.  "She considered his demands unprofessional and demeaning";

g.  "These small acts of rebellion in the face of the most powerful man in Las Vegas were followed by her being sent to the back of dance routines or removed from show routines altogether";

h.  "Witnesses who worked on the show have confirmed our client's allegations about Mr. Wynn's offensive behavior to us."

(ECF No. 1 at ¶ 66) (emphasis original).

Much of the above consists of indisputably true fact.  Statement (a) is indisputably true; Ms. Mullins accused Wynn of sexual harassment.  (*See* Mullins Decl. at ¶¶ 3-10.)  Statement (b) is true; Ms. Bloom represents Ms. Mullins.  (*See* Bloom Decl. at ¶¶ 4-5; 10.)  Statement (e) is true, as shown by the declarations of Ms. Mullins, Mr. Prattes, Mr. Cahn-Temes, and Ms. Molina. (*See* Mullins Decl. at ¶ 8; Prattes Decl. at ¶¶ 3-7; Cahn Temes Decl. at ¶¶ 3-10; Molina Decl. at ¶¶ 3-12.)  Statement (f) is true.  (*See* Mullins Decl. at ¶ 8; *see* Prattes Decl. at ¶¶ 3-7.)  Statement (h) is true. (*See* Cahn-Temes Decl. at ¶¶ 3-10; Molina Decl. at ¶¶ 3-12.)

This means that Wynn really challenges the truth of only statements (c), (d), and (g).  Wynn contends that these statements are false and defamatory primarily because they imply Wynn *personally* instructed female dancers to strip during ShowStoppers rehearsals and *personally* retaliated against Ms. Mullins for her refusal to do so, even though he did not *personally* take these actions.  This is a distinction without a difference.  "[M]inor inaccuracies do not amount to falsity unless the inaccuracies 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'"  *Pegasus*, 118 Nev. at 715 n.17.  If the "gist" or "sting" of a story is true, it is not defamatory even if some details are incorrect.  *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991).  Importantly, Wynn never specifically alleges it was false to claim that female dancers were told to strip and were retaliated against – by his agents and employees for his personal

jollies.  Rather, Wynn only alleges that he never gave such instructions.  His retraction demand states only that he did not give such commands and that he "is unaware of any such instruction ever being made."  (ECF No. 1-2 at 3-4.)  This is not the kind of distinction, even if true, that can support a claim of defamation.

Ms. Mullins and Defendants' witnesses had the understanding that the instructions from Wynn's subordinates, including his right-hand man, came at Wynn's direction, whether or not Wynn personally told dancers to strip.  In fact, it would make little sense for a reader to interpret the press release as suggesting that Wynn *personally* gave the instruction to strip, wear high heels, and apply makeup, unless he also wanted to witness the preparations for his attendance.  It would make even less sense for a reader, or anyone listening to Ms. Mullins's account, to think that Wynn just coincidentally happened to attend rehearsals at which female performers in a non-nude or non-semi-nude show were performing revealing routines in their undergarments and high heels.  It also makes no sense to assume that retaliation against Ms. Mullins for refusing to strip for Wynn was done without any input from Wynn or his agents.  The "gist" or "sting" of the press release is thus that Ms. Mullins alleged that Wynn was responsible for, and benefited from, commands to Ms. Mullins and other female performers at ShowStoppers rehearsals to strip down for Wynn for his sexual gratification, and that dancers who refused to do so were retaliated against by his company and agents.  Whether Wynn personally gave the commands to the dancers is immaterial and does not affect the "gist" or "sting" of the statements.

While Defendants are convinced that the testimony of their witnesses is accurate and truthful, they recognize that there are disputes that cannot be resolved in this summary judgment-like proceeding as to whether the remaining statements are true.  **However, the truthfulness of the statements is of no relevance to the legal analysis at this point.**  Let us presume that every statement is a blatant and provable falsehood:  Since Mr. Wynn is a public figure, he may only prevail on his claim if he can show that Defendants made these statements with actual malice – knowing falsity or a reckless disregard for the truth.  He cannot do so with clear and convincing

1   evidence, as required under the First Amendment.  *See, e.g.*, *Bose Corp. v. Consumers Union, Inc.*, 466

2   U.S. 485, 511 (1984).  Thus, as a matter of law, the Court must grant this motion.

### 4.3.2   Wynn Cannot Establish the Requisite Degree of Fault

#### 4.3.2.1   Steve Wynn is a Public Figure

5   The degree of fault required by a defendant for defamation liability to attach depends upon

6   the target and content of the defendant's speech.  There are three categories of defamation plaintiffs:

7   the general public figure, the limited purpose public figure, and the private individual.  A general

8   public figure is someone who is "intimately involved in the resolution of important public questions

9   or, by reason of their fame, shape events in areas of concern to society at large."  *Hustler Magazine v.*

10  *Falwell*, 485 U.S. 46, 51 (1988) (citing *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 164 (1967) (Warren,

11  C.J., concurring in result)).  A limited purpose public figure "voluntarily injects himself or is drawn

12  into a particular public controversy and thereby becomes a public figure for a limited range of

13  issues."  *Gertz. v. Robert Welch*, 418 U.S. 323, 351 (1974); *see also Pegasus*, 118 Nev. at 720.  This is a

14  question of law, and a court's determination is based "on whether the person's role in a matter of

15  public concern is voluntary and prominent."  *Bongiovi v. Sullivan*, 122 Nev. 556, 572 (2006).

16  Wynn is a general public figure.  He has obtained "general fame and notoriety in the

17  community, and pervasive involvement in the affairs of society …."  *Pegasus*, 118 Nev. at 720.  Wynn

18  has previously admitted to being a public figure.  *See Wynn v. Chanos*, 75 F. Supp. 3d 1228, 1238

19  (N.D. Cal. 2014); *Wynn v. Smith*, 117 Nev. 6, 9 (2001) (since the "actual malice" standard for

20  defamation liability was created, it "was extended to public figure plaintiff, such as Wynn").

21  Even if the Court somehow found Wynn to be anything less than a general public figure, he

22  is unquestionably a public figure for purposes of allegations of sexual harassment.  Ever since the

23  January 2018 WSJ article was published detailing the allegations of sexual misconduct against Wynn,

24  he "became a multi-billionaire target of a media and legal frenzy of … accusations, including …

25  accusations of rape." (ECF No. 1 at ¶ 11.)  Numerous national papers, as well as the RJ, the most

26  prominent publication in Nevada, all wrote extensively about these allegations, additional allegations,

27  the fallout from these allegations, and responses from Wynn's victims as to this fallout.  (*See*

RANDAZZA | LEGAL GROUP

**Exhibits 6-15**.)  Even if Wynn were an unknown private figure before that, this rash of attention would have catapulted him into public figure status.  Wynn then increased his profile by publicly denying the allegations and alleging a grand conspiracy orchestrated by his ex-wife.  This "media and legal frenzy" related to Wynn's sexual misconduct had existed for months before Defendants published the initial press release.  He was thus, without question, at least a limited public figure.

As a public figure, regardless of which kind, Wynn must prove that he can overcome the actual malice standard with clear and convincing evidence.  *See Bose Corp. v. Consumers Union, Inc.*, 466 U.S. at 511; *Underwager v. Channel 9 Australia*, 69 F.3d 361, 365 (9th Cir. 1995).  If he cannot do so, the Court must grant the Anti-SLAPP motion.  *See Makaeff v. Trump Univ., LLC*, 26 F. Supp. 3d 1002, 1014 (S.D. Cal. 2014) (granting Anti-SLAPP motion based on lack of evidence of actual malice).  It is a question of law whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice.  *See Underwager*, 69 F.3d at 365.

#### 4.3.2.2    The Actual Malice Standard

The term "actual malice" is unfortunate.  To the legally uneducated, implies that the speaker's motivations are at issue.  They are not.  Actual malice has nothing to do with "malice."  In fact, even if a defamation defendant is driven by malice (in the lay sense) or any other negative emotion, that is constitutionally irrelevant.  "The actual malice standard is not satisfied merely through a showing of ill will or 'malice' in the ordinary sense of the term.  Rather, actual malice is the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true."  *Lothschuetz v. Carpenter*, 898 F.2d 1200, 1206 (6th Cir.1990), *citing Harte-Hanks Comm'n v. Connaughton*, 491 U.S. 657, 666 (1989).  "The Supreme Court has repeatedly held that in defamation cases, the phrase 'actual malice' 'has nothing to do with bad motive or ill will.'"  *D.A.R.E. Am. v. Rolling Stone Magazine*, 101 F. Supp. 2d 1270, 1285-86 (C.D. Cal. 2000) (quoting *Harte-Hanks*, 491 U.S. at 667 n.7); *see also Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 52 n.18 (1971); *Beckley Newspapers Corp. v. Hanks*, 389 U.S. 81, 88 (1967) (per curiam); *Henry v. Collins*, 380 U.S. 356 (1965) (per curiam); *and see Welsh v. City and County of San Francisco*, 887 F. Supp. 1293 (N.D. Cal. 1995).

"Knowing falsity" is easy, while "reckless disregard" is a term of art.  To establish reckless disregard, a public figure must prove that the publisher "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727 (1968); *see also Bose Corp.*, 466 U.S. at 511 n.30.  Under Nevada law, reckless disregard only exists when the defendant "acted with a 'high degree of awareness of … [the] probable falsity' of the statement or had serious doubts as to the publication's truth." *Pegasus*, 118 Nev. at 719.  The question is not "whether a reasonably prudent man would have published, or would have investigated before publishing.  There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *Reader's Digest Assn. v. Superior Court*, 690 P.2d 610, 617-18 (Cal. 1984); *see also St. Amant v. Thompson*, 390 U.S. at 731.  Moreover, "[a] publisher does not have to investigate personally, but may rely on the investigation and conclusions of reputable sources." *Id.* at 619.

Finally, a defamation plaintiff must establish actual malice by **clear and convincing evidence**.  *See Bose Corp. v. Consumers Union, Inc.*, 466 U.S. at 511.  This is a requirement that presents "a heavy burden, far in excess of the preponderance sufficient for most civil litigation." *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1186-87 (9th Cir. 2001) (internal quotation marks omitted).  "The burden of proof by clear and convincing evidence requires a finding of high probability.  The evidence must be so clear as to leave no substantial doubt.  It must be sufficiently strong to command the unhesitating assent of every reasonable mind." *Copp v. Paxton*, 52 Cal. Rptr. 2d 831, 846 (Cal. Ct. App. 1996) (internal quotation marks omitted).  The same standards apply for a limited-purpose public figure when the statement concerns the public controversy or range of issues for which he is known.  *See Makaeff v. Trump Univ., LLC*, 715 F.3d 254 (9th Cir. 2013).

### 4.3.2.3    Plaintiff Cannot Show Actual Malice, or Even Negligence

Wynn alleges actual malice on three general grounds: (1) failure to investigate; (2) some inconsistencies between the March 13, 2018 demand letter and the press release; and (3) awareness of Wynn's blindness.  None of these arguments could sustain a passing class participation grade in an undergraduate journalism course's module on the actual malice standard, much less a law school exam or the exacting precision required in a court of law.

The first allegation is easily dispensed with.  Wynn claims there was an insufficient investigation because Defendants did not consult "a credible unbiased source" prior to publication and published it "without conducting a reasonable investigation."  (ECF No. 1 at ¶¶ 93, 95.)  But this is not the relevant standard.  To establish actual malice, the plaintiff must show that the defendant either knew the statements were false or harbored significant subjective doubt as to the truth of the statements.  *See Pegasus*, 118 Nev. at 719.  Indeed, "failure to investigate alone, or to read other previously printed material is not grounds for a finding of actual malice."  *Id.* at 723.

Of course, even if this Court were to apply this incorrect standard, it is laid to waste by the evidence provided in Section 4.2.4, *supra*. Defendants did investigate.  In fact, the investigation was quite thorough.  Defendants interviewed Ms. Mullins and confirmed the details of her story with other eye witnesses.  (*See* Bloom Decl. at ¶¶ 5-9; Mullins Decl. at ¶¶ 3-10; Prattes Decl. at ¶¶ 3-7; Cahn Temes Decl. at ¶¶ 3-10; Molina Decl. at ¶¶ 3-13.)  By the time Defendants published the initial press release, dozens of other individuals came forward accusing Wynn of serious sexual misconduct.  These were not allegations published in some crackpot journal; they were thoroughly vetted and published in multiple nationally acclaimed papers.  (*See* **Exhibits 6-11**.)  *See St. Amant v. Thompson*, 390 U.S. at 619 ("A publisher does not have to investigate personally, but may rely on the investigation and conclusions of reputable sources").

There was thus nothing outlandish about Ms. Mullins's story, even before corroborating it with eyewitnesses.  In fact, Wynn's systematic process of leering at scantily-clad women performing revealing dance routines specifically for his sexual gratification is positively mild compared to the already well-known accusation that he raped women with the assistance of specially-trained German shepherds.  (*See* **Exhibit 6**.)  Furthermore, despite having multiple opportunities to provide his side of the story prior to publication of the press release, Wynn made no attempt to refute any allegation in Ms. Mullins's account.  (*See* Bloom Decl. at ¶¶ 11-12.)  Wynn cannot provide any evidence that Defendants' investigation was so recklessly sloppy as to establish actual malice.  He cannot even show mere negligence.

Second, as already explained in Section 4.3.1, minor inaccuracies that do not alter the "gist" or "sting" of a story cannot amount to defamation. Wynn claims Defendants made deliberate misrepresentations because the March 13 demand letter identified Richard Gray and Marguerite Derricks as the individuals directly instructing Ms. Mullins to strip for Wynn and directly retaliating against her, whereas the March 22, 2018 press release used the passive voice without identifying these third parties. But, as already explained, this is a distinction without a difference; Ms. Mullins and Defendants' eyewitnesses understood that these commands came from Wynn, whether or not he personally gave the commands to the dancers. Wynn also refers to the March 13, 2018 demand letter mentioning that the dancers were commanded to strip down to bras, panties, *and* booty shorts, as though the omission of booty shorts in the March 22 press release is somehow incriminating. It is not, and changes nothing about the "gist" or "sting" of the release – and it would be a truly bizarre constitutional anomaly if a defamation case turned on the inclusion or exclusion of the term "booty shorts."

Third, Wynn claims Defendants simply *must* have harbored subjective doubt as to the accuracy of Ms. Mullins's story because they allegedly knew Wynn was legally blind. As already explained in Section 2.2, *supra*, legal blindness does not preclude someone from still having enough eyesight to leer at a scantily clad woman. Around the same time period, Wynn was also known for collecting fine art, a visual medium, and participated in interviews and public appearances where he discussed and displayed his visual acuity. (*See* **Exhibits 3-5**; *see also* Valencap Decl. at ¶¶ 3-6.) Even if he had no usable vision whatsoever, Defendants were unaware of this alleged blindness as of March 22, 2018, and Wynn cannot provide any evidence to the contrary. (*See* Bloom Decl. at ¶ 11.) Mr. Wynn may not have perfect eyesight, but Defendants were not aware of any facts that made the accounts of Ms. Mullins or Defendants' eyewitnesses unreliable.

Wynn's allegations as to actual malice are so weak, in fact, that the complaint could not even survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6). To defeat a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  But "naked assertions" or "conclusory statements" are not enough.  *Id.*  As to actual malice particularly, a plaintiff must allege facts that plausibly assert the conclusion of actual malice.  *See Biro v. Conde Nast*, 807 F.3d 541, 545-46 (2d Cir. 2015).  A plaintiff has to provide "specific allegations of a speaker's mindset" which must satisfy "a 'demanding burden' because 'general allegations that a defendant should have known or should have investigated the truth of his or her statements do not adequately plead actual malice.'"  *Resolute Forest Prods v. Greenpeace Int'l*, 2017 U.S. Dist. LEXIS 170927, *22 (N.D. Cal. Oct. 16, 2017) (quoting *Chanos*, 75 F. Supp. 3d at 1239).

As explained above, Wynn's allegations as to an inadequate investigation are legally insufficient, as Defendants were not required to perform any investigation at all.  Any allegation of actual malice based on discrepancies between Defendants' demand letter and the March 22 press release are insufficient, as any such differences do not alter the "gist" or "sting" of the story.  And Wynn's allegations of blindness are irrelevant because (1) he does not allege he was incapable of leering at women; and (2) he provides nothing more than a conclusory "knew or should have known" allegation as to Defendants' knowledge of this alleged blindness.  Even without all the countervailing evidence provided in this Motion, Wynn's claim would still fail.

### 4.4    The Court Should Impose Maximum Statutory Damages of $10,000 on Mr. Wynn Due to His Status as a Repeat SLAPP Plaintiff

Wynn is wealthy enough that he can afford frivolous litigation to try and silence those who would speak ill of his conduct.  The Anti-SLAPP law requires dismissal with prejudice and an award of attorneys' fees.  However, Wynn should suffer the additional disincentive in the form of the maximum possible sanction under the Anti-SLAPP law – especially given the fact that he, of all people, should know better.

In *Wynn v. Chanos*, Wynn attempted to silence a speaker at a symposium for investigative reporting on the gambling industry in China, which was attended by journalists, law enforcement, and government officials.  75 F. Supp. 3d at 1232.  The defendant in *Chanos* stated during a session

RANDAZZA | LEGAL GROUP

of the symposium that Americans involved in the Chinese gambling industry, like Mr. Wynn, had a risk of running afoul of the Foreign Corrupt Practices Act (the "FCPA").  *Id.*

Mr. Wynn misrepresented Chanos's statements, arguing that Chanos claimed Mr. Wynn himself was guilty of violating the FCPA.  *See id.* at 1231.  The court found this was not the case and granted Chanos's Anti-SLAPP motion.  The court determined both that the statements were expressions of protected opinion, and that Chanos did not make any statement with actual malice. *See id.* at 1237-40.  He continued to fight this ruling until the Ninth Circuit affirmed a little over a year ago.  *See* 685 Fed. Appx. 578 (9th Cir.).

After losing this suit, Wynn spearheaded an unsuccessful attempt to significantly weaken Nevada's Anti-SLAPP law.  (*See* John L. Smith, "Wynn has much to gain by a weakened anti-SLAPP law," LAS VEGAS REVIEW-JOURNAL (Apr. 21, 2015), attached as **Exhibit 24**.)[27]  Wynn also recently sued one of the witnesses against him (whose story provided the basis for the January WSJ article). This, too, was a defamation case – based on the witness sharing his story with the WSJ, a transparent attempt to intimidate all witnesses to his sexual misconduct.  (*See* Todd Prince, "Steve Wynn files defamation lawsuit against former hairstylist," LAS VEGAS REVIEW-JOURNAL (Apr. 29, 2018), attached as **Exhibit 25**.)[28]

Wynn has a habit of abusing the courts and his extreme wealth to intimidate his critics, regardless of the merits of his claims.  Unfortunately, NRS 41.670(b) only allows the court to impose a sanction of $10,000, which is probably a pittance to Wynn.  Nevertheless, plaintiffs like Wynn require as many disincentives to file SLAPP suits as possible, and the Court should take this opportunity to show that it will not abide Mr. Wynn's attempts to silence critics in this manner.

---

[27]    Available  at:  https://www.reviewjournal.com/business/casinos-gaming/wynn-has-much-to-gain-by-a-weakened-anti-slapp-law/ (last accessed May 10, 2018).
[28]    Available  at:  https://www.reviewjournal.com/business/casinos-gaming/steve-wynn-files-defamation-lawsuit-against-former-hairstylist/ (last accessed May 10, 2018).

RANDAZZA | LEGAL GROUP

**5.0    CONCLUSION**

For the foregoing reasons, the Court should see this SLAPP suit for what it is and (1) dismiss Plaintiff's claim with prejudice under Fed. R. Civ. P. 56; (2) award Defendants the costs and fees they have incurred in defending themselves from Plaintiff's meritless suit state law claims pursuant to NRS 41.670(1)(a) (to be quantified in a subsequent motion); and (3) award Defendants $10,000 in statutory damages under NRS 41.670(1)(b).

Dated this 15th day of May 2018.          Respectfully Submitted,

RANDAZZA LEGAL GROUP, PLLC

/s/ Marc J. Randazza
Marc J. Randazza (NV Bar No. 12265)
Ronald D. Green (NV Bar No. 7360)
Alex J. Shepard (NV Bar No. 13582)
2764 Lake Sahara Drive, Suite 109
Las Vegas, Nevada 89117

*Attorneys for Defendants,*
*Lisa Bloom and the Bloom Firm*

Case No. 2:18-cv-00609-RFB-GWF

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 15, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I further certify that a true and correct copy of the foregoing document being served via transmission of Notices of Electronic Filing generated by CM/ECF.

Respectfully Submitted,

_____

Employee,
Randazza Legal Group, PLLC